IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CLEARONE COMMUNICATIONS, INC., and EDWARD D. BAGELY, <br><br> Plaintiffs, <br><br><br> vs. <br><br><br> LUMBERMENS MUTUAL CASUALTY COMPANY, et al., <br><br> Defendants. | ORDER & MEMORANDUM DECISION <br><br><br><br><br> Case No. 2:04-CV-00119 TC |

This matter is before the court on five separate motions.  Defendant National Union Fire Insurance Company of Pittsburgh, PA, has filed one motion for summary judgment, one motion for partial summary judgment on Plaintiff Edward Bagley's claims, and a motion to clarify and/or reconsider the court's earlier Order excluding the Memorandum Decision and Order issued by the Honorable Dale Kimball in SEC v. ClearOne Communications, Inc., et al., Case No. 2:03CV55.  Plaintiffs ClearOne Communications, Inc., and Edward D. Bagley, have filed one motion for partial summary judgment on the issue of coverage, and one motion to renew consideration of the court's earlier order denying their motion for partial summary judgment on the effect of the severability clause.

In its Motion for Summary Judgment, National Union seeks a determination that it properly rescinded the  Director and Officer insurance policy ("Policy") that it issued to ClearOne because it relied on ClearOne's financial statements that were materially misrepresented.  Under Utah law, an insurance company may rescind a policy if it relied on

material misrepresentations by the insured and the misrepresentations were not "innocent misstatements."  Based upon the overwhelming evidence in the record, the court finds that National Union has shown it properly rescinded the Policy.  Accordingly, National Union's motion for summary judgment is granted.

In its Motion for Partial Summary Judgment on Mr. Bagley's claims, National Union contends that Mr. Bagley's loss is not covered by the Policy.  Mr. Bagley, a director of ClearOne, asks for damages equal to the amount his stock holdings in ClearOne will be diluted by the issuance of 1.2 million additional shares of stock as part of a class action settlement.  Because Mr. Bagley's claimed injury is an injury that he suffered as a shareholder, not an injury suffered in his capacity as a ClearOne director, National Union's motion for summary judgment is granted.

The court's decision on these two motions makes all remaining motions moot.

## **FACTS**[1]

In 2002, National Union issued a $3 million Directors and Officers Liability Policy to ClearOne.  In early 2003, the SEC brought a civil action against ClearOne, Frances Flood, ClearOne's CEO, and Susie Strohm, ClearOne's CFO, claiming that ClearOne had inflated its revenue figures.  Near the same time, several shareholders filed lawsuits against ClearOne that were eventually consolidated into a single class action.  ClearOne notified National Union of the pending litigation and of its intent to seek coverage under the Policy.  National Union responded

---

[1]The court notes that it considered fully all documents cited in this Order.  But the court has not relied upon any evidence to which it does not refer.  ClearOne and Mr. Bagley have filed objections to evidence submitted by National Union in connection with its motion for summary judgment.  To the extent that the court does rely upon evidence objected to by ClearOne and Mr. Bagley, it will be addressed within this Order.  The court does not address the objections to evidence not relied upon because the objections are moot.

2

that it intended to rescind.

## Application for the Policy

On September 13, 2002, ClearOne, through its insurance broker Crump Financial

Services, sent a letter to National Union applying for a Directors & Officers liability policy.

Crump was aware that insurers generally rely on financial statements because insurers "know

there [is] a correlation between financial performance and good management" and directed

National Union to "pull all pertinent documents from the internet for this insured."  (Dec. 7, 2004

Depo. of Janet Carmichael, attached as Ex. 82 to June 30, 2005 Supp. Decl. of Douglas R. Irvine

("Carmichael Depo."), at 17; Sept. 13, 2002 Letter from Tara Bates, attached as Ex. 30 to May 2,

2005 Decl. of Douglas R. Irvine, at 1). After it received Crump's letter, National Union began

the process of deciding whether it would issue a policy to ClearOne.

As part of this process, ClearOne completed a National Union insurance application

which in bold capital letters included the statement:  "All written statements and materials

furnished to the insurer in conjunction with this application are hereby incorporated by reference

into this application and made part hereof."   (Underwriting File, attached as Ex. 6 to Def.

Exhibits 1 through 6, Dkt. 192 ("Underwriting File"), at NU001195)  Question fourteen on the

application asks the applicant to provide copies of various documents or to indicate whether the

documents are available on the internet.  ClearOne directed National Union to its website to

obtain: (1) the "[l]atest 10K report filed with the [SEC]"; (2) the "[l]atest interim financial

statement available"; and (3) "[a]ll registration statements filed with the SEC . . . within the last

twelve months."  (Id. at NU001194)  In response to questions 4(a) and 4(b), ClearOne directed

National Union to its 10K filed with the SEC.  Frances Flood, who was CEO of ClearOne,

signed the application on behalf of ClearOne.[2]

When National Union received ClearOne's application and the accompanying documents, it began its analysis and review.  The record leaves no doubt that ClearOne carefully considered ClearOne's financial information.  Megan Lewis, a National Union underwriter, testified that she "Proceeded to read and evaluate the 10-K, the 10-Q [filed with the SEC], the kind of applicable financial statements and material that was submitted."  (Dec. 8, 2004 Depo. of Megan Lewis, attached as Ex. 48 to May 2, 2005 Decl. of Douglas R. Irvine ("Lewis Depo."), at 15)  Brady Head, a Senior Vice President for National Union, testified that National Union looks "to see that [insurance applicants] are recognizing revenue in accordance with the way that they should be."  (Dec. 8, 2004, Depo. of Brady Head, attached as Ex. 31 to May 2, 2005 Decl. of Douglas R. Irvine("Head Depo."), at 41).  Mr. Head also stated that in order to accurately assess the risk involved in issuing the policy, National Union examines the items disclosed in financial statements to the SEC.  National Union looks at "what's happening with the accounts receivable" and "sales outstanding" to determine the aggressiveness and, therefore, riskiness, of a company's revenue recognition policy.  (Id. at 46).

As it was reviewing ClearOne's information, National Union had questions about the financial statements.  Ms. Lewis testified: "After reviewing the file, I recall that the accounts receivable had jumped comparatively to the next year, and that's something I do take a look at and you want to ask why.  So we further look in the 10-Q or 10-K to find out why that was increased."  (Lewis Depo. at 28).  Nicole Brown-Simmons, another National Union employee, testified: "We reviewed [ClearOne's] 10K, various 8Ks that were filed.  Those are SEC

---

[2] The insurance application also contained a limited severability clause.  The parties dispute the effect of this clause.  But because of the scope of the court's decision, there is no need to reach this issue.

documents that we reviewed . . . . We reviewed within the 10K their financial performance."
(Sept. 21, 2004 Depo. of Nicole Brown-Simmons, attached as Ex. 83 to  June 30, 2005 Supp.
Decl. of Douglas R. Irvine ("Brown-Simmons Depo."), at 124)

Brady Head wrote an e-mail to Janet Carmichael at Crump addressing several of the
issues that arose during the underwriting process.  Specifically, Mr. Head asked "has the
company certified its financials as per the requirements of sarbanes-oxley [sic]?" and also "has
the company experienced any 'non-compliance' issues with respect to its revenue recognition
practices?" (Oct. 29 E-mail from Brady Head to Janet Carmichael with handwritten notes,
attached as Ex. 49 to to May 2, 2005 Decl. of Douglas R. Irvine ("Oct. 29 E-mail"), at 1) Mr.
Head testified that he received answers to these questions during a conference call with Susie
Strohm on October 31, 2002, and that his handwritten notes on a copy of the e-mail he sent to
Ms. Carmichael indicate the nature of the answers he received.  Mr. Head's notes[3]  and testimony
indicate that Ms. Strohm told Mr. Head that there had been no non-compliance issues with
ClearOne's revenue recognition practices and that the financial statements had been certified as
accurate.[4]  Mr. Head testified that Ms. Strohm answered any questions that Mr. Head had about
the risks involved in issuing the Policy.

When it had completed its review, National Union issued a Policy to ClearOne in the

---

[3] ClearOne and Mr. Bagley have objected to Ex. 49 on the basis that counsel for National
Union, Mr. Irvine, lacked the knowledge to provide foundation or authenticate Mr. Head's
handwritten notes.  But Mr. Head, at deposition, established that the handwritten notes on the
October 29 E-mail were created by him as a notation of Susie Strohm's answers to his questions
during the October 31, 2002 conference call.  This testimony provides sufficient foundation to
allow the court to consider the notes created by Mr. Head.  (Head Depo. at 13-14)

[4] Mr. Head's specific question was whether the financial statements had certified its
financial under the Sarbanes-Oxley Act of 2002.  Sarbanes-Oxley was intended to protect
investors by improving the accuracy and reliability of corporate disclosures made pursuant to the
securities laws.  See Pub. L. 107-204 (July 30, 2002).

amount of $3 million to run from October 29, 2002 until October 29, 2003.

**ClearOne's Business Practices**

ClearOne was founded in 1981 and initially sold telephone interface products.  It has since expanded to include the sale of audio conferencing systems and services and video conferencing products.  From the fiscal year that ended June 30, 1998, through the fiscal year that ended June 30, 2002, ClearOne's revenue grew from $15.2 million to $54.5 million and its net income grew from $1.4 million to $7.4 million.

On June 30, 2001, ClearOne altered its sales model and began selling its product through a nationwide network of distributors with a direct sales force.  At this time, ClearOne hired Tim Morrison as Vice President of Product Sales.  Mr. Morrison was responsible for management of the distribution model.  By the end of June 2001, ClearOne had recruited only one distributor, Starin Marketing.  But by the end of 2001, ClearOne had added three additional distributors, NewComm Distributing ("NewComm"), vSO Marketing, L.L.C. ("vSO"), and Pacific Technology & Telecommunications Corporation ("PT&T").  ClearOne also sold its products directly to resellers of video and audio conferencing product through a direct sales force. ClearOne publicly stated that its policy was to recognize revenue when products were shipped.

ClearOne entered into written Distributor Agreements with each of its distributors.  The agreements contained specific payment terms requiring the distributors to pay ClearOne within 90 days of receiving ClearOne products.  The Distributor Agreements also required distributors to take title to ClearOne products at the time those products left ClearOne's Utah warehouse and stated that there was no right of return.  Under the Distributor Agreements, each distributor was required to purchase a minimum of $500,000 worth of ClearOne product each quarter and maintain an adequate inventory of ClearOne products.  The Distribution Agreements also

6

specifically required that any amendments to the agreements be made in writing.

ClearOne did not always follow the terms of the Distributor Agreements.  Angelo Skiparnias, CEO of PT&T, testified : "In contrast to the terms of the written agreement, I had a verbal understanding with Tim Morrison [ClearOne's former Vice President of Sales] . . . that I was not obligated to pay ClearOne for any ClearOne products until after I sold those products to a PT&T customer."  (Jan. 14, 2003 Decl. of Angelo Skiparnias, attached as Ex. 28 to May 2, 2005 Decl. of Douglas R. Irvine ("Skiparnias Decl."), at ¶ 4)[5]  Mr. Skiparnias estimated that "almost 100%" of the inventory that he received between December 2001 and October 2002 was covered by that oral agreement.  (Id. at ¶ 5)  Mr. Skiparnias stated: "At the end of each of ClearOne's fiscal quarters, ClearOne required PT&T . . . to accept inventory that it did not want and could not sell."  (Id. at ¶ 6)  Mr. Skiparnias continued: "Morrison told me that, as with all ClearOne products, PT&T would not be required to pay ClearOne for that extra inventory until it sold the products to its customers."  (Id. at ¶ 6) Mr. Skiparnias understood that "PT&T was required to accept the additional inventory in order for ClearOne to meet its quarterly sales or revenue projections."  (Id. at ¶  7)  Mr. Skiparnias testified that as of January 14, 2003: "I have approximately  $1 million plus of ClearOne products in my inventory that I have not paid for and will not pay for until they are sold."  (Id. at ¶ 9)  According to Mr. Skiparnias, ClearOne sent PT&T invoices reflecting prices that were higher than agreed upon: "For example, at the end of one quarter PT&T received over one years [sic] worth of inventory of their video codecs.  Those video units were invoiced to PT&T at the price PT&T usually sells the units to its customers." (Id. at ¶  10).

_____

[5]ClearOne and Mr. Bagley have objected to paragraphs 12 and 13 of Mr. Skiparnias' declaration.  The court has not relied on those paragraphs.

David Francis, president of Newcomm, another distributor, testified: "Contrary to the terms of the written contract with NewComm, ClearOne, through Tim Morrison, agreed to alter NewComm's payment terms and allow NewComm to pay for ClearOne products as they sold so long as NewComm agreed to take additional ClearOne inventory." (Jan. 14, 2003 Decl. of David Francis, attached as Ex. 11 to May 2, 2005 Decl. of Douglas R. Irvine ("Francis Decl."), at ¶ 7).[6] Mr. Francis testified in his deposition: "[A]t the end of each quarter . . . we would be approached by ClearOne with the dollar figure that we needed to hit and we would in those cases . . . negotiate . . ., and try to come up with some agreement on what we would take in." (Dec. 15, 1004 Depo. of David Francis, attached as Ex. 26 to May 2, 2005 Decl. of Douglas R. Irvine ("Francis Depo."), at 25) According to Mr. Francis, sometimes NewComm would receive product that it did not need or want, but NewComm ordered the product "[b]ecause we were asked by ClearOne." (Id. at 29)  Mr. Francis gave an example of this practice:

> [A]t the end of one quarter NewComm placed an order with ClearOne for three codec video units.  Instead of receiving the three it ordered, NewComm received 40 units.  Most of those 40 units, valued at over $140,000, are still in NewComm's inventory and have not been paid for. . . . Over the last year, NewComm has received more [than] $700,000 worth of inventory that it did not want.  Approximately $266,859 of that inventory is still in NewComm's warehouse.

(Francis Decl. at ¶¶ 12-13). Mr. Francis testified that the additional product was part of a "pay as you sell" arrangement: "When we would sell product and we would receive payment, we would then pay ClearOne." (Francis Depo. at 27)

Mr. Francis described a meeting held in May 2002 that he and the other distributors attended.  Mr. Francis testified: "Fran [Flood] said we would be getting contacted by analysts

---

[6]ClearOne and Mr. Bagley have objected to paragraphs 11 and 15 of Mr. Francis' declaration.  The court has not relied on those paragraphs.

and were not to let them know that we were on the pay as you go and we were just to tell them it was the standard terms as per the contract." (Francis Depo. at 32)

At one point, ClearOne asked the distributors to certify that they were obligated "to pay for the Products pursuant to the terms of the" agreements, and also that non-payment was the result of collection problems on the part of the distributors. In January 2003, Mr. Francis was asked by ClearOne to sign a "Distributor Certification." The document repeated the terms of the Distributor Agreements and stated: "There were no verbal or written agreements between the Distributor and ClearOne which altered the understanding that all Products shipped to the Distributor became the sole property of the Distributor." (Francis Decl. at ¶ 6) Mr. Francis signed the Distributor Certification with an attached addendum in which he explained: (1) there was a "'pay as you go . . . oral understanding between ClearOne and the Distributor"; (2) that some of the products shipped were not saleable; and (3) that the only products for which NewComm had not paid were those under the "pay as you go" program. (Francis Decl. at 7).

Mike Oltz, managing member of vSO, testified about a June 28, 2001 conference call between Mr. Oltz, Jim Starin of Starin Marketing, Tim Morrison and Frances Flood, where they discussed the possibility of Mr. Oltz becoming a ClearOne distributor. During that telephone call "Flood said that for purposes of the accountants and legal requirements, ClearOne would require payment for shipments . . . in 90 days." (Jan. 31, 2003 Decl. of Mike Oltz, attached as Ex. 25 to May 2, 2005 Decl. of Douglas R. Irvine ("Oltz Decl."), at ¶ 9) Mr. Oltz testified that Ms. Flood then stated: "In writing there is a brick wall at 90 days, in practice there is not." (Id.)

Mr. Oltz testified that he accepted a large shipment from ClearOne in September 2001 with this understanding: "Morrison told me that vSO Marketing could wait and pay ClearOne for the shipment when the products sold to third parties." (Oltz Decl. at ¶ 13). According to Mr.

9

Oltz, this conduct was repeated at the end of each of ClearOne's fiscal quarters after September

30, 2001: "At the end of virtually every quarter . . . , we were either asked to take more

merchandise than we projected we needed and had ordered, or more merchandise would show

up.  And I was instructed, told, by people within ClearOne, that I did not need to pay for that

product until it was sold.  And until it was actually paid for . . . ."  (Feb. 10, 2005 Depo. of

Frederick Oltz, attached as Ex. 24 to May 2, 2005 Decl. of Douglas R. Irvine ("Oltz Depo."), at

21-22).  Mr. Oltz described one such incident:

> The week after March 26, 2002 . . . I placed an order for approximately $280,000
> of ClearOne products.  Instead of receiving the products I had ordered, I received
> $500,991 in merchandise . . . .  The additional merchandise was on 'extended
> terms' which I requested be spelled out on the purchase order.

(Oltz Decl. at ¶ 16).  Mr. Oltz testified that he was told by Tim Morrison that he had to accept the

additional inventory or ClearOne would stop doing business with vSO Marketing.   Mr. Morrison

also refused to accept inventory that vSO marketing sought to return.  (Id. at ¶¶ 25-26)

Mr. Oltz testified that he attended a meeting on January 2, 2003, at ClearOne's

headquarters with Jim Starin. Mr. Oltz further testified that: "Flood ushered both Starin and me

into her office.  Flood gave us copies of Distributor Certifications and asked that we sign them."

(Oltz Decl. at ¶ 29)  Mr. Oltz continued:

> I was hesitant to sign the Distributor Certification because it did not accurately
> reflect the business relationship between vSO Martketing and ClearOne.  Flood
> told both Starin and me that all the other distributors had signed the document and
> I sat there and watched as Starin signed his certification.  This left me very
> uncomfortable as I was reportedly the only distributor who had not yet signed the
> certification.

(Id. at ¶30).  Eventually Mr. Oltz signed the Distributor Certification.  He testified: "Flood's

urgency and false claim that 'everyone' had signed the certification together with my fear that

vSO's relationship with ClearOne would be in jeopardy if I did not sign the certification lead me

to sign the certification."  (Id. at ¶33)

Scott Wysota was not an official distributor for ClearOne but testified that he was contacted by ClearOne and was asked for a "favor": "[Frances] Flood requested that I accept shipment of 100 V-There video conferencing units from ClearOne.  Flood told me I would not have to pay for the V-There video units until the units sold to third parties."  (Jan. 16, 2003 Decl. of Scott Wysota, attached as Ex. 33 to May 2, 2005 Decl. of Douglas R. Irvine ("Wysota Decl."), at ¶ 4)[7]  Mr. Wysota continued:  "I understood from my conversations with Flood that she wanted me to accept the units in order to assist ClearOne in meeting its annual sales and revenue projection.  I also understood that ClearOne did not expect me to sell any of the V-There products."  (Wysota Decl. at ¶ 7)  Mr. Wysota received the 100 V-There units, worth approximately $5,000 each, and stored them at his home for seven months, until they were retrieved by ClearOne.  (Wysota Decl. at ¶¶ 8-11)

Former ClearOne employees have also provided testimony that the terms of the Distributor Agreements were not strictly enforced.  Tim Morrison provided sworn testimony in the SEC action that business was conducted on a pay-as-you-sell basis, rather than  according to the ninety-day payment term.  He testified that product was shipped to the distributors with the understanding that the distributors would not pay for that product until it was sold.  Misty Chalk,

---

[7]ClearOne and Mr. Bagley have objected to Mr. Wysota's declaration on the grounds that Mr. Wysota took the Fifth Amendment and would not subject himself to examination about his statements.  ClearOne and Mr. Bagley write: "Because Mr. Wysota will not be a witness at trial, the Court should not consider his declaration as it is hearsay."  (Pla. Obj. Evid. Matrls. Submitted by Def. in Connection with Summ. J. at 10) First, the suggestion that Mr. Wysota might not testify at trial is insufficient to render his testimony hearsay and, further, it is speculative. Second, under 28 U.S.C. § 1746, an unsworn declaration "which is dated and signed by the declarant under the penalty of perjury, has the same force and effect as a sworn affidavit for the purposes of any requirement imposed by any federal rule or regulation."  Davis v. Frapolly, 756 F. Supp. 1065, 1067 (N.D. Ill. 1991). See also 28 U.S.C. § 1746; Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Intern., Inc., 982 F.2d 686, 690 (1st Cir. 1993).

formerly ClearOne's Regional Sales Manager and acting National Sales Manager,  confirmed

much of Mr. Morrison's testimony in her own sworn statements to the SEC.

Ms. Chalk testified that Ms. Flood and Mr. Morrison would "sweep the floor" at the end

of every quarter by sending large amounts of inventory to the distributors.  Ms. Chalk also

testified that distributors could not have paid for the additional inventory without the pay-as-you-

sell modifications to the Distribution Agreements and often  had nowhere to store the additional

inventory provided by ClearOne.  (Jan. 13, 2003 Testimony Tr. of Misty Chalk, attached as Ex.

70 to June 30, 2005 Supp. Decl. of Douglas R. Irvine ("Chalk Tr.") at 25)[8]  Ms. Chalk described

a transaction in which ClearOne asked NewComm to take "a million dollars' worth" of product,

despite NewComm's inability to warehouse the inventory.  NewComm never paid for the

inventory and never distributed the inventory.  (Id. at 25-26; 60-61)

ClearOne's former manager of manufacturing and Director of Manufacturing, William

Olpin testified that: "At the end of each of ClearOne's reporting periods, beginning at the end of

March 2001, I was instructed by [Ms. Flood and Mr. Morrison] to ramp up manufacture of

ClearOne products to enable ClearOne to ship out enough to meet quarterly revenue and sales

projections."  (Decl. of William Olpin, attached to Ex. 73 to June 30, 2005 Supp. Decl. of

Douglas R. Irvine ("Olpin Decl."), at ¶  4).[9]

---

[8]ClearOne and Mr. Bagley have objected to this testimony of Misty Chalk on the grounds
that it is hearsay because neither ClearOne nor Mr. Bagley "were present during the
examination" of Ms. Chalk by the SEC and also that there is insufficient foundation for her
statements. Pla. Obj. Evid. Matrls. Submitted by Def. in Connection with Summ. J. at 3)   First,
the fact that neither ClearOne nor Mr. Bagley were present during the SEC examination of Ms.
Chalk does not render her testimony hearsay and that objection is not persuasive.  Second, the
court has examined the portions of Ms. Chalk's testimony upon which the court relies and
determined that there is sufficient foundation for her testimony.

[9]ClearOne and Mr. Bagley have objected to paragraphs five through nine of Mr. Olpin's
declaration on the basis that Mr. Olpin is not competent to testify to the matters contained therein
and on the basis that the statements are conclusory.  The court does not rely on that portion of

### Restated Financial Statements

On January 21, 2003, ClearOne issued a press release which stated:

> At this time, the Company's financial statements for the fiscal years ended June 30, 2001, and June 30, 2002, and for the quarters ended March 31, 2001, through and including Sept. 30, 2002, are under review.  At this time, investment decisions should not be made based on these financial statements, or on the auditor's report included in the Company's 2002 Annual Report as filed on Form 10K.  In addition, the guidance given by the Company on Oct. 23, 2002, for the fiscal year ending June 30, 2003, should be treated in the same manner.

(Jan. 21, 2003 Press Release, attached as Ex. 9 to May 2, 2005 Decl. of Douglas R. Irvine ("Press Release"), at 1)

In its August 18, 2005 10K filing with the SEC, ClearOne restated its financials for the fiscal years 2001, 2002, and 2003, and offered an explanation for the restatement.  The 10K filing reads:

> This report contains . . . our restated audited consolidated financial statements for the fiscal years ended June 30, 2002 and 2001.  In connection with the restatement, we performed a comprehensive review of our previously issued consolidated financials statements for fiscal years 2002 and 2001 and identified a significant number of errors and adjustments.  The restated consolidated financials statements . . . resulted in cumulative net reductions to stockholder's equity as of June 30, 2002 and 2001 of approximately $17.4 million and approximately $3.8 million, respectively, and reductions in previously reported net income for the years ended June 30, 2002 and 2001 of approximately $14.1 million and $3.9 million, respectively.

(Aug. 18, 2005 10K Filing with SEC, attached as Ex. 93 to Sept. 2, 2005 Request For Judicial Notice ("Aug. 18, 2005 10K"), at 5)  ClearOne gave this explanation for its errors:

> We have a material weakness with respect to accounting for revenue recognition and related sales returns, credit memos, and allowances.  Our accounting policies and practices over revenue recognition and related sales returns, credit memos, and allowances were inconsistent with generally accepted accounting principles in the U.S. (GAAP). . . . Related sales returns and allowances, rebates, and accounts receivables were also misstated as a result of the errors in revenue recognition.

---

Mr. Olpin's declaration and does not address ClearOne and Mr. Bagley's objection.

(Id. at 64)

ClearOne's August 18, 2005 10K filing acknowledged that it inappropriately accelerated revenue: "We recognized revenue before the amounts charged to both distributors and non-distributors were considered fixed and determinable or reasonably collectible."  (Id. at 37)  ClearOne stated that the distributors did not have the financial resources to pay for ClearOne products when delivered.  (Id.)

### The SEC Lawsuit and the Consolidated Shareholder Class Action

On January 15, 2003, the SEC initiated a civil action alleging that ClearOne, Ms. Flood, and Ms. Strohm had engaged in a program of inflating ClearOne's revenue, net income, and accounts receivable by engaging in improper revenue recognition.  The SEC action was resolved on December 4, 2003, when ClearOne entered into a consent decree consenting to a permanent injunction prohibiting future securities law violations.  ClearOne did not admit or deny the allegations. (Final Judgment as to ClearOne Communications, Inc., Case No. 2:03CV0055 DAK, attached as Ex. 2 to May 2, 2005 Decl. of Douglas R. Irvine)[10]  No fine or penalty was assessed against ClearOne.  Ms. Flood and Ms. Strohm also entered into consent decrees in the SEC action and also did not admit or deny the allegations. (Final Judgment as to Frances M. Flood, attached as Ex. 3 to May 2, 2005 Decl. of Douglas R. Irvine; Final Judgment as to Susie Strohm, attached as Ex. 4 to May 2, 2005 Decl. of Douglas R. Irvine)  Ms. Flood and Ms. Strohm were

---

[10]ClearOne and Mr. Bagley have objected to court's consideration of the consent decrees entered in the SEC action.  ClearOne and Mr. Bagley rely on  Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976), for the proposition that consent decrees may not be used as evidence in subsequent litigation between a party to the decree and another entity.  ClearOne and Mr. Bagley's reliance on Lipsky is misplaced.  In that case, the court explained that consent decrees, like pleas of nolo contendere, may not be used for purposes of collateral estoppel because the issues in the underlying action were not fully adjudicated.  Id.  Here, the court the court considers the consent decrees only as part of the factual background of this case.

each fined by the SEC and entered into separation agreements with ClearOne.

On June 30, 2002, ClearOne shareholders filed a consolidated class action suit against ClearOne, various officers and directors, and against their former auditor, Ernst & Young.  (The class action consolidated earlier-filed actions by individual shareholders)  The shareholders' allegations were similar to those made by the SEC.  On December 4, 2003, ClearOne entered into a settlement agreement in the class action on behalf of all defendants except Ernst & Young. The settlement agreement calls for the payment of $5 million and the issuance of 1.2 million shares of common stock.[11]

At the time this lawsuit was filed, Plaintiff Edward Bagley owned approximately 15% of the outstanding ClearOne shares. Mr. Bagley, as a ClearOne director, was named as a defendant in the underlying shareholder class action lawsuit and was included in the settlement agreement. But Mr. Bagley  was not personally responsible for payment of any of the settlement and did not personally contribute to the shares of common stock to be issued as part of the settlement. ClearOne paid Mr. Bagley's defense costs.

As a shareholder, Mr. Bagley was technically a member of the plaintiff class in the underlying suit, but as a settling defendant, he was not entitled to any portion of the settlement. The Stipulation of Partial Settlement reads:  "Excluded from the Settlement Class are the Settling Defendants . . . ."  (Dec. 1, 2003 Stipulation of Partial Settlement in Case No. 2:03CV0062 PGC, attached as Ex. 85 to to June 30, 2005 Decl. of Douglas R. Irvine ("Stip. of Settlement"), at 7)

In early 2003, ClearOne notified National Union that it had been sued by various shareholders and that ClearOne and Mr. Bagley would be seeking coverage for their losses under

---

[11]As of August 18, 2005, 228,000 shares of stock had been issued with plans to issue the remainder of the 1.2 million shares subject to a May 23, 2005 Amendment to the settlement agreement.  It appears that ClearOne has already paid the entire $5 million.

the Policy.  But National Union responded:

> We must, however, advise you that based upon the Company's own
> announcements regarding, among other things, certain of its financial statements,
> (i) National Union relied on those financial statements in issuing the Policy, (ii)
> those financial statements were material to National Union's decision to issue the
> Policy, (iii) National Union believes it has acquired knowledge of sufficient facts
> to constitute a general defense to all claims under the Policy and (iv) it is National
> Union's intention to defend against claims for coverage . . . . Specifically, it is
> National Union's intention to rescind the Policy.

(March 19, 2003 Letter, attached as Ex. 7 to May 2, 2005 Decl. of Douglas R. Irvine ("Mar. 19

Letter"), at 2).  It is National Union's rescission of the Policy that gave rise to the current lawsuit.

## CLEARONE AND MR. BAGLEY'S ALLEGED DISPUTED ISSUES OF FACT

ClearOne and Mr. Bagley contend that National Union's motion for summary judgment

on the issue of rescission should be denied because of disputed issues of material fact.

Specifically, ClearOne and Mr. Bagley assert that there are questions regarding: (1) whether Fran

Flood knew of the alleged side agreements or any potential claims against ClearOne; (2) whether

there were unwritten side agreements or modifications to the Distributor Agreements; and (3)

whether the financial statements were material to National Union's decision to issue the Policy

and whether National Union relied on the financial statements.[12]

### Fran Flood's Knowledge

ClearOne contends that there are disputed facts on the question of Fran Flood's

knowledge.  The court first notes that Ms. Flood's knowledge, as signor of the insurance

application, is key to the applicability of the severability clause.  But this is not the issue before

the court.  The relevant question is whether ClearOne, as a legal entity, made misstatements in its

---

[12]Earlier, ClearOne argued that the press release warning regarding its financial
statements was not sufficient for a finding that the statements were, in fact, false.  This argument
fails, however, due to ClearOne's August 18, 2005 filing with the SEC acknowledging the
misstatements.

financial statements provided to National Union.  And, if so, whether ClearOne, as a legal entity, was "innocent" when it made those misstatements.  Accordingly, Ms. Flood's knowledge is not determinative as it applies to the court's finding that ClearOne's misstatements were not innocent. Further, the evidence relied upon by ClearOne as showing that there are genuine issues of material disputed facts regarding Ms. Flood's knowledge does not support ClearOne's position.

ClearOne has directed the court to Ms. Flood's certification on ClearOne's 10-K signed September 24, 2002, in which she swore that she had reviewed the document and that it was accurate and complete.  (Depo. Ex. 28 in  Pla. App. of Evid. Matrls. Opp. Def. Two Mot. Summ. J. ("App."); Dec. 14, 2004 Depo. of Frances Flood in App. ("Flood Depo. in App.") at 136:11-137:23)  ClearOne has also directed the court to Ms. Flood's testimony that "at the time I signed [the 10K], to the best of my knowledge, it was accurate" and also to her testimony that she was unaware of any grounds for any claim under the policy.  (Flood Depo. in App. at 174:25-176:22 & 30:18-30:23).  ClearOne also contends that the fact that Ms. Flood purchased ClearOne stock during the time of the alleged side agreements refutes the claim that she had knowledge of improper revenue inflation.  None of these facts, by themselves, is sufficient to show that ClearOne was "innocent."

ClearOne points  to Mr. Morrison's deposition where he testified that Ms. Flood refused to acknowledge any "pay as you sell" terms.  But ClearOne has taken this testimony out of context.  At his February 2, 2005 deposition, Mr. Morrison was questioned regarding earlier sworn testimony he gave to the SEC.  Mr. Morrison confirmed his earlier statements where he testified that Ms. Flood:

> forgot her commitments to the distributors to pay as you sell or collect credit terms.  She told me and the executives, and I won't use the dirty word, but F the

> distributors.  They are just sitting on their asses and we have carried them through
> the down market, F returning their product.  Tell them to get off their asses, sell it
> and pay us what they owe us.

(Feb. 2, 2005 Depo. of Tim Morrison in App. ("Morrison Depo. in App.") at 323:15-323:21).

According to the testimony, Ms. Flood "forgot" about the "pay as you sell" arrangements. This

testimony does not show Ms. Flood's ignorance of the side agreements, but rather affirmatively

demonstrates that such agreements did exist and that Ms. Flood did know of them.  According to

Mr. Morrison, Ms. Flood wanted the distributors to "sell it and pay us what they owe us."  This

is, again, consistent with the existence of a "pay as you go" arrangement.  Mr. Morrison was also

asked in deposition if in October of 2002 he "tried to remind [Ms. Flood] about this supposed

pay as you sell, pay as you go like terms" and he responded: "I didn't have to remind her.  She

knew of it."  (Id. at 320:8-320:21)

ClearOne asserts that Ms. Flood only had sporadic communications with the distributors

as that was generally Mr. Morrison's responsibility. The testimony of Ms. Flood to which

ClearOne directs the court reads: "I may have sent [the distributors] an e-mail or two over the

course of the year, but the lion's share of the communications between the distributors and the

company was represented by Tim Morrison."  (Flood Depo. in App. at 43:17-43:20)

Significantly, there is nothing in the record where Ms. Flood denies making the specific

statements to which the distributors have referred about paying for product only as it was sold.

ClearOne relies on testimony indicating that Ms. Flood told Mr. Morrison to tell the truth

to ClearOne's auditors.  ClearOne has directed the court to Mr. Morrison's deposition where he

testified that he was told to tell the truth and that he was forthright and truthful with the auditors.

(Morrison Depo. in App. at 233:22-234:2 & 234:11-235:15) But again, Mr. Morrison's

testimony must be read as a whole.  Mr. Morrison explained: "I was told to tell the truth, but not

to offer any additional information other than answering the questions that I was asked."

(Morrison Depo., attached as Ex. 13 to May 2, 2005 Decl. of Douglas R. Irvine, at 146:17-19:19)

The auditors did not ask about "pay as you go" arrangements and Mr. Morrison did not tell them

about the arrangements.  (Id.)  When asked at deposition whether he told the auditors about

"stuffing the channel," Mr. Morrison responded: "They didn't ask."  (Id. at 236)  The

information provided by Mr. Morrison to the auditors was essentially limited to confirming that

the payment terms of the Distributor Agreements was a 90-day term.

### The Existence of Modifications to the Distributor Agreements

ClearOne and Mr. Bagley contend that there are disputed issues of fact as to whether

ClearOne entered into agreements with the distributors that provided payment terms other than

the term included in the Distributor Agreements.  The evidence relied upon by ClearOne as

showing that there are genuine issues of material disputed facts regarding the existence of "pay

as you sell" arrangements does not support ClearOne's position

ClearOne and Mr. Bagley note that after September 11, 2001, distributors asked for

additional time to pay their outstanding accounts receivable.  According to ClearOne and Mr.

Bagley, ClearOne agreed to be "flexible" and to "work with" these distributors and that these

terms were disclosed in its 10K filing with the SEC and to National Union.  ClearOne has

directed the court to ClearOne's 10K filing with the SEC included in its 2002 Annual Report.  In

that document ClearOne stated that it had "extended longer payment terms" to its distributors.

(Depo. Ex. 652 in App. at 30).  ClearOne also points to Tim Morrison's deposition where he

testified that: "There were discussions with [the distributors] that we would work with them,

which is no different that what I was used to in [the steel industry]" and that ClearOne was

willing to "work with" the distributors  (Morrison Depo. in App. at 303:25-304:15 & 319:7-

320:7) But the fact that ClearOne was willing to "work with" the distributors during a period of economic difficulty is not the same as saying that "pay as you sell" arrangements did not exist and does not create a disputed issue of fact.

ClearOne directs the court to the testimony of Ms. Flood where she testified  that she first heard of "pay as you sell" in December 2002 during a conversation with a distributor who broached the subject, and again after the commencement of the SEC action.  (Flood Depo. at 50:10-52:10).  ClearOne also relies on testimony by Ms. Strohm where she was asked if her "understanding of things at ClearOne is that it was not a pay as you sell program?"  And she responded: "That's right."  (Strohm Depo. in App. at 12:2-12:5)  ClearOne also asserts that Tim Morrison testified that he had never heard Ms. Strohm or Ms. Flood use the terms "pay as you sell" or "pay as you go," that he never used the terms, and that he would remind late-payers of the ninety day terms. (citing Morrison Depo. in App. at 211:10-216:9 & 304:11-304:15) But examination of this evidence shows that it does not support ClearOne's argument.

Mr. Morrison testified that he never heard Ms. Strohm or Ms. Flood use the exact terms "pay as you sell" or "pay as you go": "I have been telling everyone that asked me that that is not a term that we use within the company.  It's a term that has come about since this action.  Those would not be my exact words, pay as you sell, no."  (Morrison Depo. in App. at 211:18-21)  Mr. Morrison testified: "I recall simply saying that you will pay for it when you sell it, but not a term like a pay as you sell, no."  (Id. at 212:23-211:25).  When asked again if he used those phrases Mr. Morrison reiterated: "[N]ot the exact words, but certainly the intent."  (Id. at 213:14) When asked if Ms. Flood used the phrase "pay as you go" Mr. Morrison testified: "I don't recall when she said it, but the intent was there."  (Id. at 215:2-215:4).  He testified similarly to Ms. Strohm.

ClearOne's "disputed fact" rests primarily on the use of particular language.  Mr.

Morrison was clear that the exact phrasing was not used, but that the intent was present and that "pay as you sell" arrangements existed.  Ms. Flood and Ms. Strohm's denial that they ever used the term "pay as you sell" proves only that the term itself was not used, not that the practice itself did not.

ClearOne and Mr. Bagley further contend that Mr. Morrison sent the distributors a letter notifying them of a change from a 90-day payment term to a 60-day payment term and affirmatively reminded the distributors who were late in paying under the terms of the Distributor Agreements that payment was due according to their agreement.  Again, ClearOne ignores the entirety of Mr. Morrison's testimony.  There is no dispute that the payment term was changed from 90 days to 60 days and that  after deciding to "work with" the distributors after September 11, 2001, Mr. Morrison reminded the distributors that their contracts contained a 90-day payment term.  (Morrison Depo. in App. at 304:11-304:15).  But Mr. Morrison further testified: "I reminded [the distributors] that they had to start paying on 60-day terms once I instituted the new contracts . . . , and tried to clean up the sins of the past.  But I don't specifically recall reminding people that they had to pay in 90 days."  (Id. at 305:11-305:16)

ClearOne and Mr. Bagley assert that ClearOne's auditors received certifications from each of the distributors confirming the terms of the Distributor Agreements and contend that none of the distributors mentioned any oral arrangements with ClearOne effecting the payment terms.  (Pla. Mem. Opp. Mot. Summ. J. at 14) NewComm, Starin, PT&T, Collin Stevenson, vSO and Scott Wysota, all apparently did complete the certifications affirming the terms of the Distributor Agreements.  (Depo. Ex. 239 in App.)  These unsworn confirmations essentially recounted the amounts owed to ClearOne for shipped merchandise and recite a 90-day payment term.  But, as discussed earlier, Mr. Francis and Mr. Oltz later testified that they were instructed

21

to conceal the truth of their arrangements and coerced into signing these confirmations.[13]

## ANALYSIS

In it's motion for summary judgment, National Union seeks a determination that it properly rescinded the Policy issued to ClearOne on the basis that its financial statements were misstated.  In a separate motion, National Union seeks summary judgment on Mr. Bagley's claims arguing, in part, that the injuries claimed by Mr. Bagley are not considered a "loss" within the meaning of the policy.

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c);  see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

## RESCISSION

Utah Code Annotated § 31A-21-105(2) sets the standard for rescission of an insurance policy:

> No misrepresentation or breach of an affirmative warranty affects the insurer's obligation under the policy unless:
> (a) the insurer relies on it and it is either material or is made with intent to deceive; or
> (b) the fact misrepresented or falsely warranted contributed to the loss.

---

[13] Mr. Stevenson did testify that he did not have a "pay as you sell" arrangement with ClearOne.  But this testimony shows only that ClearOne did not have side agreements with all its distributors.

U.C.A. § 31A-21-105(2).   See Derbidge v. Mutual Protective Insur. Co., 963 P.2d 788, 790-91 (Utah App. 1998).   Here, there is no question that the financial statements provided by ClearOne to National Union were misstated.

### ClearOne's Financial Statements Were Material to National Union's Decision to Issue a Policy and National Union Relied on Those Financial Statements.

A misrepresentation is material if it diminishes an insurer's opportunity to evaluate or estimate risk.   Berger v. Minn. Mut. Life. Ins. Co., 723 P.2d 388, 391 (Utah1986); see also Utah Power & Light v. Federal Ins. Co., 983 F.2d 1549, 1555 (10th Cir. 1993).   The "test for whether a fact is material to the risks assumed under an insurance policy is whether 'reasonable insurers would regard the fact as one which substantially increases the chance that the risk insured against will happen and therefore would reject the application.'"   Utah Power & Light, 983 F.2d at 1555 (quoting Hardy v. Prudential Ins. Co. of America, 763 P.2d 761, 769-770 (Utah 1988)); see also Berger, 723 P.2d at 391; Burnham v. Bankers Life & Cas. Co., 470 P.2d 261, 281 (Utah 1970); Cutter & Buck, Inc. v. Genesis Ins. Co., 306 F. Supp.2d 988, 1003 (W.D. Wash. 2004).

A company's financial statements are indicative of its financial health and, therefore, generally evaluated by an insurer before issuing a policy.   The court in Cutter & Buck, Inc. v. Genesis Ins. Co., 306 F. Supp.2d 988, 1003 (W.D. Wash. 2004), addressed facts very similar to those here.   In Cutter & Buck, the insurer sought to rescind a policy on the basis that the financial statements were materially misrepresented and it had relied upon them.   The court noted the general principle that when an insurer asks for no information pertaining to a particular matter, it can be assumed that the matter is not material.   Id. at 1003 (citing US Credit Life. Ins. Co. v. McAfee, 630 P.2d 450 (Wash. App. 1981)).   But the court noted that the opposite is also true:   "This implies that when an insurer specifically asks information in regard to a certain matter, the presumption is that the matter is material."   Id. (citing numerous non-Washington

cases for this principle).

Here, National Union specifically asked for the financial statements and ClearOne directed National Union to its website where the statements were available.  In response to two other questions on its insurance application, ClearOne referred to its 10K.  National Union employees testified that they considered and reviewed the financial statements in order to assess the risk.  ClearOne's insurance broker noted that insurers generally review financial statements in deciding to issue a policy.

ClearOne contends that National Union was well aware of ClearOne's business practices and the potential problems with its financial statements and, therefore, could not have relied on them.  But this argument is not supported by the evidence.  Brady Head testified that, although he initially had concerns regarding ClearOne's business practices, Ms. Strohm's answers to his questions during their telephone conversation erased his concerns.   The contradiction in ClearOne's argument is that it contends that ClearOne itself was ignorant of its own financial irregularities yet, at the same time, those irregularities were so apparent that National Union could not have relied on the financial statements.

Based on the facts, the court concludes that ClearOne's financial statements were material to National Union's decision to issue the Policy and that National Union reasonably relied on those financial statements.

### ClearOne's Financial Statements Were Not Innocent Misstatements.

There is no question that ClearOne's financial statements were misstated.  But in order to qualify as a misrepresentation for the purposes of rescission under U.C.A. § 31A-21-105(2), a misstatement must be more than an innocent misstatement.  Derbidge v. Mutual Protective Insur. Co., 963 P.2d 788, 793 (Utah App. 1998).  In Derbidge, the insured was attempting to recover

24

under an insurance policy for a loss as a result of Alzheimer's disease.  In her initial application

for insurance the insured had represented that she did not suffer from any "[o]rganic mental

disease or disorder (such as Alzheimer's disease)" Id. at 789.  But unknown to the insured, her

physician had diagnosed her as likely suffering from an "organic brain syndrome," although he

had not treated her for the disease or informed her of the diagnosis.   The court determined that

"requiring that an applicant have at least some knowledge or awareness of her misstatement is

consistent with principles of insurance law enunciated after Utah enacted statutory standards for

misrepresentation." Id. at 794 (emphasis added).

　　　　The record, as discussed in the ClearOne's Business Practices section above, shows that

ClearOne entered into Distributor Agreements with the stated policy of recognizing revenue

when product shipped.  But the common practice was that ClearOne did not require payment for

product according to the terms of the Distributor Agreements and allowed the distributors to pay

for product when it was sold.  Additionally, ClearOne would ship product to the distributors

without having received an order for that product.  It is clearly these practices which gave rise to

ClearOne's financial misstatements.

　　　　ClearOne acknowledged that it was its business practices that caused the errors in its

financial statements:

> We have a material weakness with respect to accounting for revenue recognition
> and related sales returns, credit memos, and allowances.  Our accounting policies
> and practices over revenue recognition and related sales returns, credit memos,
> and allowances were inconsistent with generally accepted accounting principles in
> the U.S. (GAAP).

(Aug. 18, 2005 10K at 64)  Unlike the insured in Derbidge who had no way to know that she had

Alzheimer's disease, and therefore was, indeed, "innocent" when she answered "no" to the

question of whether she had an "[o]rganic mental disease or disorder (such as Alzheimer's

disease),” ClearOne through its practices <u>caused</u> the inflated revenue figures.  ClearOne, as an entity, was certainly aware of the conditions which gave rise to the misstated financial statements and had a reason to know that its financial statements were incorrect.[14]  Accordingly, the provision of those misstatements to National Union was not innocent.

**ClearOne's Additional Arguments Are Not Persuasive**

ClearOne has also argued: (1) that the financial statements were not, and cannot be, incorporated by reference into the Policy; and (2) that ClearOne never claimed that the statements were accurate.  These arguments are not persuasive.

ClearOne relies on Utah Code § 31A-21-106(1)(a) for the proposition that the documents must be incorporated into the policy.  The statute reads:

> [A]n insurance policy may not contain any agreement or incorporate any provision not fully set forth in the policy or in an application or other document attached to and made a part of the policy at the time of its delivery, unless the policy, application, or agreement accurately reflects the terms of the incorporated agreement, provision, or attached document.

U.C.A. § 31A-21-106(1)(a).  This statute applies to additional <u>agreements and provisions</u> incorporated into a policy.  The financial statements provided by ClearOne do not constitute an agreement or provision of the Policy.  In <u>Cullum v. Farmers Ins. Exch.</u>, 857 P.2d 922 (Utah 1993), the court wrote: “[Section 31A-21-106's] aim is to ensure that the entire insurance contract is contained in one document so that the insured can determine from the policy exactly what coverage he or she has.”  <u>Id.</u> at 925.  The court continued: “The entire point of section 31A-21-106, however, is to ensure that an insured does not have to rely on information outside the

---

[14]An actual conscious purpose to deceive is not necessary. <u>See Id.</u> at 792 n.2 (citing <u>Berger v. Minnesota Mut. Lis. Ins. Co.</u>, 723 P.2d 388, 391 (Utah 1986)); <u>Zolintakis v. Equitable life Assur. Soc. of U.S.</u>, 97 F.2d 583, 586 (10th Cir. 1938); <u>Fidelity & Cas. Co. of New York v. Middlemiss</u>, 135 P.2d 275, 279 (Utah 1943).

policy itself to know its terms." Id. at 926.   Here, the issue is the veracity of documents

submitted in ClearOne's insurance application, not the scope of coverage.  Section 31A-21-106

simply does not apply.

ClearOne's contention that it never claimed that its financial statements were accurate has

no merit.  The financial statements were signed by Ms. Flood and then-CFO Randall J.

Wichinski and contained the statement:

> 1.  I have reviewed this Annual Report on Form 10-K of ClearOne
> Communications, Inc. (the "Annual Report");
>
> 2.  Based on my knowledge, this Annual Report does not contain any untrue
> statement of a material fact or omit to state a material fact necessary to make the
> statements made, in light of the circumstances under which such statements were
> made, not misleading with respect to the period covered by this Annual Report;
> and,
>
> 3.  Based on my knowledge, the financial statements, and other financial
> information included in this Annual Report, fairly present in all material respects
> the financial condition, results of operations and cash flows of ClearOne
> Communications, Inc., as of, and for, the periods presented in this Annual Report.

(Depo. Ex. 652 in App. at 67) Additionally, the insurance application signed by Ms. Flood

contained the provision that: "the statements set forth herein are true."  (Underwriting File at

NU001194).

The financial statements were provided to National Union by ClearOne's insurance

broker in the initial letter seeking coverage by reference to ClearOne's website and also in its

application for a Policy.  The evidence demonstrates that ClearOne held those statements out as

accurate to the SEC, National Union, and the public.

The court concludes that National Union has shown that its rescission of the Policy was

appropriate under Utah Code § 31A-21-105(2).

## MR. BAGLEY'S CLAIMS

National Union has moved for summary judgment on Mr. Bagley's claims contending that the injury for which Mr. Bagley seeks coverage does not qualify as a loss under the policy. Mr. Bagley seeks coverage based upon the dilution in value of his ClearOne stock attributable to the issuance of 1.2 million additional shares of stock in settlement of the class action. (As a shareholder Mr. Bagley was apparently eligible to received a portion of the class action settlement.  But the class action settlement contains language excluding the settling defendants from the class to whom the settlement would be distributed.)

ClearOne was presented with two options to settle the underlying class action lawsuit: (1) payment of  $5 million in cash and the issuance of 1.2 million shares of common stock; or (2) payment of $10 million in cash to the class.  Mr. Bagley alleges that he:

> preferred that ClearOne settle the Consolidated Class Action without the issuance of 1.2 million shares of ClearOne common stock.  The issuance of such shares would dilute Bagley's significant equity ownership in ClearOne; in essence, by ClearOne's issuance of such shares, Bagley would be forced, by the dilution, to contribute approximately ten percent (10% of his shareholdings to settle the Consolidated Class Action.  (This contribution is even more apparent because Bagley was excluded from the class of persons to whom distributions of the class action settlement would be made.)

(Answer and Counterclaim, Dkt. 16, at 18)  Mr. Bagley claims: "The Damages Bagley has suffered by the significant dilution of his shareholdings in ClearOne constitutes a 'Loss' under [the Policy]."  (Id. at 20)   Mr. Bagley contends that because National Union refused to pay $3 million on the Policy, ClearOne was forced to issue 1.2 million shares of stock thereby diluting the value of his stock.   National Union contends that Mr. Bagley's claimed loss was a loss suffered by him in his capacity as a shareholder, not in his capacity as an insured Director of ClearOne and is not covered under the Policy.

The Policy, entitled "Executive and Organization Liability Insurance Policy," provides:

> This policy shall pay the Loss of any Insured Person arising from a Claim made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such Insured Person.

(Underwriting File, Ex. 6, at NU001133) Mr. Bagley is an insured person under the Policy because of his status as a director of ClearOne.  The Policy defines "Insured Person" as an "Executive of an Organization." (Ex. 6 at NU001136)   "Executive of an Organization" is, in turn, defined as: "past, present and future duly elected or appointed director, officer, trustee or governor of a corporation . . ."  (Ex. 6 at NU001135)

The law has long recognized a distinction between a person's shareholder capacity and his director capacity.  See, e.g., " Lochhead v. Alacano, 697 F. Supp. 406, 413 (D. Utah 1988); see also In re Kaiser Merger Litigation, 168 B.R. 991, 999 (D. Colo. 1994)(citing Harriman v. E.I. DuPont de Nemours & Co., 372 F. Supp. 101, 105-06 (D. Del. 1974)).  Mr. Bagley's claimed injury is the dilution of the value of his shares of ClearOne stock as a result of the settlement of the consolidated class action. This injury is the same injury suffered by all other shareholders.  Mr. Bagley's injury is not one suffered by him in his capacity as a director, but only in his capacity as a shareholder.

Mr. Bagley also argues that the loss in value of his stock are "consequential damages" resulting from National Union's breach of an implied covenant of good faith in the Policy.  But Mr. Bagley must show that National Union breached its contract with him, or, possibly, with ClearOne.  As the court has found in this Order, National Union has committed no breach. Mr. Bagley cannot receive consequential damages where there is no breach.

**ORDER**

For the reasons set forth, National Union's Motion for Summary Judgment is GRANTED

and National Union's Motion for Partial Summary Judgment on Mr. Bagley's claims is

GRANTED.  All remaining motions are denied as moot.


DATED this 21st day of October, 2005.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge